Mid-Vermont Christian School v. Nichols-Hetfall. All right, Mr. Cortman. Cortman. Cortman, I'm sorry. That's a misreading. Mr. Cortman, you have reserved two minutes for rebuttal. So that gives you eight minutes to begin. You may proceed. Good morning, Your Honors. My name is David Cortman. I represent the plaintiff's appellants in this matter. May it please the Court. The harm that Mid-Vermont and its students are continuing to face is extreme. After 30 years of being part of the VPA, all of its teams and all of its athletes are being denied participation in the state sports league. The district court was wrong to deny a preliminary injunction for three reasons. First and importantly, the VPA's general policy is that boys and girls should be separated in sports. But it has at least six ways of engaging in individualized assessments as to whether that policy remains in place. Just one was sufficient in the Fulton case to rule against the government there. It allows forfeits for many secular reasons, but not for religious reasons. Second, the hostility the VPA has shown throughout this process exceeds what was found in both the Masterpiece Case case and the New Hope case from this circuit. Third, penalizing Mid-Vermont for its religious exercise violates the trilogy for exercise cases of Trinity Lutheran, Espinosa, and Carson. I'll start with the individualized assessment. I want to first point out that the VPA states its interest at three different levels. And I want to talk through that because the changing of levels has been a conversation from the Supreme Court since the Masterpiece Case. What's the government's statement of interest? Your initial request didn't cite any religious objection. It was fairness and safety. That's correct. How does that factor into this? I don't think it does because in the letter a few weeks later, the Mid-Vermont basically said this is pursuant to our religious beliefs, and that was a month and a half before the final expulsion decision was made. Also, the religious beliefs were addressed in the expulsion letter, and basically the VPA said those religious beliefs are wrong. And so that was dealt with ahead of time. Also, in Vicki Fogg, who's the head of school, in her declaration, I believe it's on the paragraphs 15, 16, 17, and then like 97 through 101, she explains the tie between the religious beliefs and the safety and fairness and says that they're all tied together. So clearly they were on notice of the religious beliefs, they considered it when they went in their deliberations, and they even addressed it in their final expulsion letter as to why the religious beliefs were involved and why they were, according to them, wrong. So I don't think it's a factor that it wasn't in the initial correspondence because it was in all the correspondence after that. Well, I mean, one could even read the correspondence to suggest that the invocation of a religious motivation made the response of the state even worse, like that they were more incensed at religion as a basis for the forfeiture than if it had just been safety. Well, and that's exactly right. And what's interesting, if you look at the Masterpiece line of cases and you look at hostility in the New Hope case, when you look at the commentary based on those religious beliefs being forwarded, rather than saying, okay, we understand there's some religious beliefs involved, they said those beliefs were ludicrous, they said those beliefs were wrong, you're hiding behind them to harm other people. Those were the same types of statements that the Supreme Court found in Masterpiece and also found in New Hope. And what's interesting about the levels, if you will, the VPA's policies have six different individualized mechanisms for exemptions from these type of issues here. So whether you're looking at the government interest as being all athletes being able to play in sports, which is one way they state it, or you're looking at the interest at a lower level of just transgender athletes being able to play, their policies allow individualized assessments on every one of those levels. So I want to talk about those real quickly because Fulton had one ability, one paragraph where it had the ability to waive the exemptions. We have six of them in this policy. The first one is the VPA can waive any eligibility requirement at all, and of course this is an issue about eligibility. That can be found at JA 152. Second, the VPA can waive any policy it has, which is exactly what was found in the Fulton case. That's also at JA 152 in their policy. And then, as I mentioned before, the general rule in their own policy, which is at JA 159, is that boys and girls should be separated in sports. So even the ability of the transgender athlete to compete is an exception to their main policy, which again puts it under Fulton. And that's done, according to the policy, on a case-by-case basis. So the way that works is that the individual school decides whether that particular athlete can compete on the teams, and then if the student's not satisfied, they can appeal that up to the VPA, then the VPA decides on a case-by-case basis whether that athlete can compete at all. So if the government interest is whether an athlete can compete in a game, the VPA undermines its interest way worse by saying you can't compete in any sport, any game, as opposed to the single forfeit based on the religious beliefs of Mithra Ma. So that matters because you have to individualize discretion and you have to individualize assessment. And the Supreme Court has basically said that when you look at the interest, even if you look at it in the nondiscrimination tone, the question is, is there a compelling interest in not granting an exemption to Mithra Ma? And what the court has said is when you undermine that interest with all these other exemptions, you're actually required to give the exemption to Mithra Ma because of all this individualized assessment that they've made. But the individualized assessments don't go to people's world views or that. They're related to whether someone truly has a sexual identity that's different from their sex that they're assigned at their birth. I mean, it's different than that, isn't it? Well, it's only different on one level but not on the level that matters, and here's what I mean by that. If you look at the government interest and that is either all students being able to participate in athletics or you look at transgender students being able to participate in athletics, that's the government interest. And the question is, do these case-by-case exemptions undermine that? So the reasons why actually doesn't help. But isn't the issue a reason why someone would not want to compete against someone else? It is, but the violation – Is there a mechanism whereby a school can say, we disagree with the gender assigned to a player on an opposing team? Yes, sir. Simple question. Well, here's why I'm having a hard time answering that. Their policy allows a school to say that that athlete can't compete at all. So if the interest is the athlete competing, that's completely undermined by the athlete not getting to play. Now, if you're looking at why someone doesn't play against another team, it's the same with the COVID exemption. Well, the COVID exemption is related to a health-related identified thing. I don't see how that's a comparator at all. Well, the reason it's a comparator is because the government states its interest as all athletes being able to compete. I understand that, but if someone makes a decision that they're competing against an athlete and that athlete, a particular athlete, has an exemption from the masking requirement, everyone else has to wear the mask, that's a function of health as opposed to religious policy. But that's a question of – I don't see how that's a comparator at all. And I would say it is a proper comparator when you look at the level – It's not discriminatory in any way, nature. I mean, that's the question, right? Well, actually, I want to address that real quickly. When we talk about discrimination in this case, it's not about gender identity. It's about sex. The VPA claims that Midvermont discriminated based on gender identity. The gender identity didn't matter. It's the fact that a male was competing on a female team. And when you look at all the briefing, including the reply brief for page 6, Midvermont clearly says this is because we're playing against a biological male. It doesn't matter how the male identified. And, in fact, another proof of that is if you look at the record of the district court when – I don't know how that makes any sense because the reason why the person who's playing on the team and was assigned the sex of male at birth is because they are transgender. This is a policy choice – Let me finish. This is a policy choice made by Vermont and the people of Vermont. Whether it's a good policy choice or not is another matter. But it's a policy choice. And so it's not that they're objecting to the fact that it's a male. It's a person who was assigned male who's been allowed transgender status, isn't it? It is not. And more evidence of that is you can look at the district court's order at the end of Appendix Volume 4 where the Midvermont was allowed back in for the non-athletic activities, for the spelling bees and the debates. Let me ask you a question. If they had a game and they made a determination that the athletes on the opposing team were just so physically imposing because they were just extraordinary athletes and they decided to forfeit the game, what would be the repercussions there? The repercussion would be if they forfeit the game, they would take the loss just like is done with all other forfeits. They wouldn't be kicked out of the league. And the harshness of the penalty also goes to the hostility. So that's really your argument, isn't it? I mean it seems to me that if the forfeiture had taken place because it was prom night or because it was ring night at the school, then you lose the game and that's the end of it. It's that the forfeiture was accompanied by a statement, and that statement is not acceptable. So it's a speech test that requires the school to say we agree with you. It is, and it's a devaluing of the religious reason to Your Honor's question. If there's other reasons, as Your Honor mentioned in your hypo for forfeiting, but there's a religious reason for one. All the way back to Lacuna, the court said you're devaluing the religious reason for punishing that forfeit different from other forfeits, which goes back to the COVID exemption and Your Honor's hypotheticals. And so that's the exact problem is once we find out this is based on a religious belief, rather than respecting that and treating it the same as all other forfeits, there's this harsh penalty that comes in and bans not only the forfeit for that game and taking the loss, which was punishment enough because they were out of the state tournament. This is a team that competes for the state championships. The punishment they accepted was fine, we lose the game, we're out of the tournament. But then the VPA came back and said now you're banned from every sport, boys and girls, including all the other non-academic activities. And so that shows not only the hostility, it also shows that the individualized assessment undermines whatever level of government interest you want to put it at. It shows that's undermined by all of those individual assessment abilities. If there's no further questions, I'll save the remainder of my time. All right. Well, you've reserved two minutes for rebuttal. Thank you. But now I'll hear from Mr. Zakrzewski. Am I saying that right? Yes, Your Honor. Really? That's never happened before, Your Honor. Well, it may not happen again. But Zakrzewski. All right. Mr. Zakrzewski, the floor is yours. Good morning, Your Honors. May it please the Court. I'm Steve Zakrzewski. I represent Jane Nichols in his official capacity as the executive director of the Vermont Principals Association, which is a small organization charged with administering an athletic league in compliance with state law. The appellants obviously argue that the Principals Association's policy compels them to violate their religious beliefs simply by playing in a basketball game against a team with a trans student. But it's a speech. Isn't this a speech test? Why don't we just call it that? It's respectfully, Your Honor, it's not a speech test. Had a school refused to or chosen to forfeit a game because it was ring night or because it was prom night, that would not evince discrimination against a class of students that's protected under Vermont law. And that's really the issue here. The plaintiffs contend that they were punished, simply just wanted to forfeit a game. First, I think it's important to keep in mind that their conduct is active. It's not passive as they've continually characterized it. They are asking in the injunction that they're requesting in this case, they're asking for prescriptive relief to be allowed to remain in the league while telling other teams who can be on their team, who can compete against us. If there's a trans child on your team, not only can they not compete against us, but that entire team cannot compete against us. And their conduct is important. And that's the speech. You don't like that speech. You don't like them saying that. No, they're free to say what they want. But they can't be in the league if they say what they want. They cannot be exempt from the policies that apply to all of the teams in the league that are grounded in Vermont law. But the policy is what? That you have to endorse the statement of the VPA, right? No, Your Honor. The policy is that you cannot discriminate against a child in a protected class. And it's not limited to trans children. It's about children in any protected class. And this is very important. The plaintiffs have not said you simply forfeited this game. We intend to come back in the league and compete and play our full schedule. The plaintiffs are saying we are not going to have to play against a team with a trans child ever. Presumably this injunction would require the Principals Association to somehow track trans athletes and try and schedule games accordingly. I will get to later that it's both impractical and unworkable. Even before you get into that, I mean, the punishment here is wildly overbroad. It's girls, boys, co-ed, athletics, non-athletics. I mean, that seems nothing but punitive. It's an interesting question, Your Honor. I think it goes to show that there's no anti-religious animus and that it is not intended. No, but it is coupled with statements that say this is a guise, the religious defense of the forfeit. And so I'm not sure that that's right. Understood. I would like to take that as two sort of separate subpoints. One, being that once the plaintiffs committed to participating fully in co-educational activities, they were permitted to do so. The plaintiffs are now permitted to participate in all co-educational activities, trivia bowls, math olympiads, things of that nature. Because Judge Crawford made you, I mean. It was an agreement that was reached voluntarily after this was the first time that we understood the plaintiffs committed to participating fully against all children and all protected classes. And they were allowed back in promptly, which I think goes to show a lap of anti-religious animus. To Your Honor's second point about the statements, I think. How is allowing a co-ed chess team back out of your punishment show that it was not religiously motivated? Because it's not about the viewpoint motivating the conduct. It is about the conduct itself, which is actively discriminating against kids in a protected class in violation of the law that we're bound to follow, which is the Vermont Public Accommodations Act and the Agency of Education's best practices. But the conduct can be religiously motivated. So, I mean, this is a situation where it seems to be there are both things happening, right? There is conduct that could be religious, but also could not be. That's an excellent point, Your Honor. And the record in this case shows that that conduct would be treated the same way. And certainly there's no evidence that secular conduct would be treated differently. That is a critical point because I think one of the things— How do you know that? I thought you said this was—you admitted this was unprecedented, right? The police here. So one way that I think we know that is because the initial correspondence that the plaintiffs sent refusing to play against the child in question was on February 16th, 2023. And that letter did not mention any sort of religious justification at all. That letter raised purely secular concerns, and those secular concerns were rejected. So that is the best precedent that exists regarding how secular conduct would be treated. A key legal issue in this case is whether the district court correctly held that the policy at issue was subject to rational basis review or strict scrutiny. And I think the district court's decision was grounded in sound precedent, quoting Employment Division v. Smith, that we have never held an individual's religious beliefs excuse him from compliance with an otherwise valid law prohibiting conduct that the state is free to regulate. And on its face, the policy at issue, the Public Accommodations Act, they are generally applicable. They make no distinction between religious and nonreligious actors or actions. But isn't that itself, in district religious animus, if they're saying this is because of our beliefs, and you're saying no, it's not. This has nothing to do with your faith. No, Your Honor. We are – there is no evidence that a secular school providing purely secular reason would be allowed to do what the plaintiffs have done.  And the statements were not tantamount to we are not letting you do this because of your religion. The statements actually at issue in this case rise nowhere near the level of what was at issue in Masterpiece Cakeshop, where there were statements comparing the baker in that case to Nazis and slave owners.  It's far from that level. But it is – I mean, you have a speaker who's suggesting that this is an insincere belief or this is an irrational belief. If this were really the way you believe, then BYU couldn't play against Notre Dame. I mean, isn't that a statement about the religious – either the rationality or the sincerity of the religious belief? I think that the speaker was merely meaning to indicate that it does not require one to compromise their religion to participate according to the same rules that everyone else in this voluntary association has agreed to participate. It's a suggestion that the statement of religious belief is a pretext, is false, right? I'm not sure that that's a fair – So what is the point of saying it then? I'm not sure that that's a fair inference. So what is the right – Those comments. Tell me, the BYU-Notre Dame statement, what is the proper way to interpret that? That by a big part of the plaintiff's justification and rationale for wanting to forfeit is that playing in this game is forcing them to compromise their religious beliefs. And I think that written statement Your Honor is referring to is providing a comparator of a religious school not compromising their religious beliefs simply by sharing the court. That's like saying some Catholics are taking the COVID vaccine and therefore your refusal to must show that it's either not a sincere religious belief or it's not a Catholic belief and you're out of luck. And we've rejected that before, right? Respectfully, Your Honor, I don't believe that's the issue in this case. I think that the issue is whether anyone would or should be permitted to refuse to participate against a certain protected class of students. And I think that it is very important to the plaintiff's argument that they want strict scrutiny to apply to the policies at issue. And the cases that are cited in support, that they're discussed and cited in support of that argument are very readily distinguishable. Primarily the Church of Lukumi, the Trinity Lutheran, the Espinoza case, the Carson case. Those all apply strict scrutiny because the laws, the rules, the policies at issue in those cases were specifically about religion. An ordinance barring religious ceremony, a policy of denying religiously affiliated grant applications, a rule against allowing financial assistance for religious schools and students. The policy at issue in this case is not about religion at all. And so then that brings you to the question of whether there are individualized exemptions that invite the Principal's Association to scrutinize the school's reasons for seeking them. And the exemptions that the plaintiffs are relying on are not pertaining to this specific policy against discrimination, nor to this specific type of action, refusing to play against students in a certain protected class. This Court, in the Emily Carpenter case, very correctly focused on a narrow question of whether there's evidence that an exemption exists, has been applied to the same policy, to the same type of conduct. And here I believe there is no evidence of comparable secular conduct that has been allowed while the plaintiff's conduct has been disallowed. And, Your Honor, I see that I'm over my time. May I have one more minute to treat a sort of a different issue that I didn't have an opportunity to get to? Yeah. I think if the Court is to order injunctive relief, it would have to answer a pretty extensive series of questions about how that would work in practice. How would trans students be tracked? Is there a physical examination requirement? Who would conduct those examinations? What would they look like? How would they be funded? How does scheduling be made fair, particularly playoff schedules, which are about regular season records and often single elimination tournaments? How much notice must schools give if they're going to refuse to play against a given opponent? What sort of rationale is sufficient? Is it enough if the school's heard rumors that a student on another team might be trans? What if a school shows up to play and the player on the girls' team looks like a boy or has masculine features? Well, what you could do is just have a rule of general applicability about what happens when you forfeit a game. This rule is basically saying that there's a rule of general applicability with respect to what happens when you forfeit a game for impermissible reasons, right? I think that rule would be highly undesirable because schools would be free, under that rule, to refuse to play games for openly discriminatory reasons. And I think that the government has a very strong interest in not allowing that type of conduct. Yes, Your Honor? If the school board thought not for religious reasons but just thought it was unfair, the reason that was originally offered, and the school ordered its athletic department to forfeit a game where a trans student was on the other side, apparently that would not fall, that would be problematic? Yes, Your Honor. That would be extremely problematic. So the religious reason had never been offered. Well, but so apparently if it's a refusal because you don't think it's fair, then that's discriminatory. But if it's a refusal because you don't think it's fair because that's part of your religious beliefs, you can do that. I think that's the result that the plaintiffs are advocating for, and I think that considering what the injunction would actually look like in practice and all that it would require drives home the point that it should not enter at all. We therefore ask this honorable court to affirm the district court's decision, and we thank the court for the opportunity to present this argument. Okay. Thank you very much. We'll now hear from Mr. Cortman for two minutes of rebuttal. Thank you, Your Honors. Just a couple of points. Opposing counsel started by saying mid-remark can't be exempt from these policies, but the individualized assessments require an exemption under Fulton. And I want to talk real quickly about the non-discrimination interest that Your Honor has discussed and opposing counsel talked about. Well, because you're the one who offered the fact that it was – that their conclusion that it was unfair was a function of their religious belief, and that's why later it was raised in the letter. And it struck me as curious then that it was a function of their religious belief. But if I held it just because I didn't want my daughter to play against a trans student, I couldn't offer that. Well, the – It's the same reason. Except for the religious reason. That it's not fair. The religious reason raises the free exercise claim, whereas Your Honor's reason wouldn't. So my reason is discriminatory, and the religious reason is not. Well, I don't – as I mentioned before – Well, that's another good question. It may be, but here the Public Accommodation Act doesn't even apply to Midvermont. It's another argument we made. So that's a question because they rely on their policies to develop the Public Accommodation Act. It doesn't even apply to Midvermont. So the whole basis for applying this non-discrimination interest, it's not even there in the first place. So adding to that, the Supreme Court has said it's not the question whether there's a compelling interest in non-discrimination, which is what Your Honor is asking about. The question is, is there a compelling interest to exempt Midvermont from that? And the answer under Fulton is yes. So I appreciate the arguments about why other people would do this. How many religious schools are there in Vermont? I do not know, Your Honor. But in this particular instance – How many? You don't know? How many religious schools – Can you argue this case and you don't know? How many religious schools are in Vermont? Yeah, how many religious schools that participate in these athletics are there in Vermont? I honestly do not know and couldn't guess. I imagine there's several, but I don't know the answer. But I don't think it matters because, again, depending on how you describe the government interest here, the VPA undermines those interests to an even greater extent. And I want to talk about the fact that the VPA not considering the religious implications that they were given notice of in the letter. This is the final expulsion letter. The school claims we should grant its appeal because it burdens their exercise of religious belief. The school claim is wrong. This case has nothing to do with religious beliefs. And that's exactly the point. They addressed their religious beliefs and basically told the school their religious beliefs are wrong, which is unconstitutional under Masterpiece and under Fulton. If this had been race and the reason for not participating was because their religious beliefs prohibited them from participating against each other, would that be discriminatory and would that be appropriate? I apologize. I didn't catch the essence of that. If the religious reason, if this had been about race and the school would offer a reason that because of their religious viewpoints, it prohibited them from races participating against each other, would that be, could the school offer that and offer religious entitlement to free expression of their religion? It could offer it. In this particular policy, I think the school would still win because under their policy, there's six levels of exemptions. In that case, there would be for race, as there is here for gender identity. So you still have the same individualized assessment that undercuts their interest. Assuming the policy didn't have those six individualized exceptions, then the school could raise it as a religious belief, may lose under the compelling interest test. So it's not that they would win. And the school wouldn't be able to say their beliefs are wrong. They would have to say the beliefs, we understand these are your beliefs, but you may lose under the compelling interest test. If the individualized assessments were there, the VPA would still lose because its interest on race would be undercut by all the assessments that are left. Thank you, Your Honors. All right. Well, thank you both. We will reserve decision.